# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

June 23, 2026

Scott S. Harris
Clerk of the Court
(202) 479-3011

Clerk
United States Court of Appeals for the Sixth Circuit
540 Potter Stewart U.S. Courthouse
100 East Fifth Street
Cincinnati, OH  45202-3988

FILED
Jun 24, 2026
KELLY L. STEPHENS, Clerk

Re:  Michael Pung, Personal Representative of the Estate of Timothy
     Scott Pung
      v. Isabella County, Michigan
     No. 25-95
     (Your No. 22-1919, 22-1939)

Dear Clerk:

The opinion of this Court was announced today in the above stated case. A copy of the opinion is available on the Court's website at www.supremecourt.gov.

The judgment or mandate of this Court will not issue for at least thirty-two days pursuant to Rule 45.  Should a petition for rehearing be filed timely, the judgment or mandate will be further stayed pending this Court's action on the petition for rehearing.

Sincerely,

**Scott S. Harris**, Clerk

by

(Slip Opinion)  OCTOBER  TERM,  2025  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PUNG, PERSONAL REPRESENTATIVE OF THE ESTATE OF PUNG *v.* ISABELLA COUNTY, MICHIGAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 25–95.  Argued February 25, 2026—Decided June 23, 2026

The Pung family owed $2,241.93 in real-property taxes, so local tax authorities in Isabella County, Michigan, initiated foreclosure proceedings and sold the Pung home—which was assessed at $194,400 for tax purposes—for $76,008 at public auction.  Michael Pung sued in Federal court, and the District Court granted Pung partial summary judgment on his Fifth Amendment claim.  The court held that Pung should receive only the surplus proceeds from the tax sale—*i.e.*, the difference between the sale price and the tax debt—not the property's fair market value.  The District Court also rejected Pung's claim under the Eighth Amendment Excessive Fines Clause.  The Sixth Circuit affirmed.

*Held*:

1. The proper baseline for measuring "just compensation" following a tax sale is the auction sale price, not the property's hypothetical fair market value, at least when the sale is fairly conducted in light of the country's history of tax sales.  Pp. 4–11.

(a) For hundreds of years, English and American law have allowed the seizure and sale of property as a tax-collection method, provided that the government return any surplus proceeds to the debtor.  Federal statutes from the early days of the Republic applied this rule, as did this Court's precedents. *United States* v. *Taylor*, 104 U. S. 216; *United States* v. *Lawton*, 110 U. S. 146; *Nelson* v. *City of New York*, 352 U. S. 103; *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531.  Pp. 4–6.

(b) Neither  history  nor  precedent  supports  Pung's  contrary

2 PUNG *v.* ISABELLA COUNTY

Syllabus

argument. Pung's reliance on a recent concurrence by a Justice of the Supreme Court of Michigan interpreting the State Constitution does not shed much light on the Takings Clause's meaning, see *Rafaeli, LLC* v. *Oakland County*, 505 Mich. 429, 485–522, 952 N. W. 2d 434, 466–487 (Viviano, J., concurring). Cases about the seizure of multiple pieces of property do not help him because the County sold just one parcel of Pung's real property, and Pung does not argue that the parcel could have been subdivided. Eminent-domain cases do not help him either because, even in that context, this Court has "refused to designate market value as the sole measure of just compensation," *United States* v. *564.54 Acres of Monroe and Pike County Land*, 441 U. S. 506, 512. Fair market value is not an appropriate measure of just compensation in this context because owners can generally avoid tax sales.

Pung's fair-market-value theory would impose unprecedented burdens on jurisdictions that wish to collect unpaid taxes and might well make tax sales impractical. Under Pung's rule, a tax sale would often net the government a loss, paid out to the delinquent taxpayer himself, rendering tax sales infeasible as a debt-collection mechanism. That Pung's novel interpretation of the Takings Clause would eliminate this longstanding practice is strong evidence that his interpretation is incorrect. Pp. 6–10.

(c) The Court will not resolve any of Pung's newfound contentions that the *procedure* the County followed in seizing and selling his property was unfair. The Sixth Circuit may address on remand any such arguments properly preserved in that court. Pp. 10–11.

2. The Court rejects Pung's argument that the County violated the Eighth Amendment Excessive Fines Clause by failing to compensate him for his property's fair market value. Forfeiture of property can be a "fin[e]" for purposes of the Eighth Amendment if it serves "in part to punish." *Austin* v. *United States*, 509 U. S. 602, 610. Pung lacks precedent or historical evidence suggesting that a tax sale which is fairly conducted in light of our Nation's history would violate the Eighth Amendment. In addition, imposing Pung's fair-market-value rule under the Eighth Amendment would entail the same drastic consequences as imposing the rule under the Fifth Amendment. Pp. 11–12.

Vacated and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, BARRETT, and JACKSON, JJ., joined, and in which THOMAS, J., joined except as to Part II–B. SOTOMAYOR, J., filed a concurring opinion, in which GORSUCH and JACKSON, JJ., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which GORSUCH, J., joined except as to n. 1.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 25–95

### MICHAEL PUNG, PERSONAL REPRESENTATIVE OF THE ESTATE OF TIMOTHY SCOTT PUNG, PETITIONER *v.* ISABELLA COUNTY, MICHIGAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 23, 2026]

JUSTICE ALITO delivered the opinion of the Court.

When taxpayers fall behind on their property-tax bills, federal, state, and local governments alike have long used foreclosure and sale as a collection method. In *Tyler* v. *Hennepin County*, 598 U. S. 631 (2023), we held that the Fifth Amendment Takings Clause requires the government to return any surplus proceeds from tax foreclosure sales, *i.e.*, the difference between the sale price and the taxpayer's debt. The question presented here is whether the government must pay more when the sale price falls below the property's hypothetical fair market value. In other words, is the constitutional baseline for "just compensation" the actual tax-sale price or the price that someone would pay for the property in a hypothetical open-market transaction?

We conclude that the proper baseline under the Takings Clause is the price obtained in a tax sale, at least when the sale is fairly conducted in light of our country's history of tax sales. We also hold that, following a tax sale, the Eighth Amendment Excessive Fines Clause does not require the government to return more than the surplus proceeds.

2 PUNG *v.* ISABELLA COUNTY

Opinion of the Court

Neither the Fifth nor the Eighth Amendment requires the government to compensate former owners based on the hypothetical fair market value of their property.

I

In 2010, a local tax assessor denied the Pung family a state-law tax exemption for principal residences. The Pungs took the dispute to the Michigan Tax Tribunal, where they prevailed, but that did not end the matter. They had to litigate a similar dispute in the state courts when the assessor once again denied the exemption. In this second round, the Pungs prevailed again. Yet they still owed $2,241.93 in real-property taxes. The family refused to pay, and Isabella County, Michigan (County), initiated foreclosure proceedings. Although a state trial court blocked the proceedings at first, the Michigan Court of Appeals allowed the foreclosure and sale to proceed. The County followed the procedures required by the Michigan General Property Tax Act. That Act required the County to give the Pungs a period of redemption to pay off their tax debt, to provide public notice of the tax sale, to sell the property to the highest bidder, and to obtain a judgment of foreclosure from a Michigan court. See Mich. Comp. Laws §211.78m (West 2026); App. 85–88. At a public auction, the Pung home sold for $76,008, even though its assessed value for tax purposes was $194,400.[1] The County initially kept all the sale proceeds.

Michael Pung sued in Federal court, claiming that the County violated the Takings Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment. The District Court granted Pung partial summary judgment on his Fifth Amendment claim, holding that he was entitled to the surplus proceeds from the tax sale. Because it ruled for Pung on his Fifth Amendment claim, the

───────────

[1] Nearly 18 months later, the auction purchaser re-sold the property for $195,000.

Opinion of the Court

District Court concluded that it need not reach the question whether the Eighth Amendment demanded a similar result. But while agreeing with Pung that the County had to refund the surplus proceeds of the tax sale, the court rejected his argument that compensation should be measured by the property's fair market value.

Pung appealed, and the Sixth Circuit affirmed. Based largely on Circuit precedent, the court held that a "'plaintiff whose property is foreclosed and sold at a public auction for failure to pay taxes is [not] entitled to recoup the fair market value of the property.'" App. to Pet. for Cert. 11a (Pet. App.) (alteration in original). Instead, "'when a municipality sells foreclosed property at a properly conducted auction,' the owner is entitled to 'the amount of the sale above his debt and no more.'" *Ibid.* Thus, the court concluded that Pung should receive $73,766.07—the difference between the sale price of the home and the tax debt.

The Sixth Circuit also rejected Pung's Eighth Amendment claim. Bound by Circuit precedent, the court held that the Michigan tax-foreclosure regime was not punitive and thus not "within the ambit of the Eighth Amendment." *Id.*, at 15a. Pung then sought certiorari on the following two questions:

> "1. Whether taking and selling a home to satisfy a debt to the government, and keeping the surplus value as a windfall, violates the Takings Clause of the Fifth Amendment when the compensation is based on the artificially depressed auction sale price rather than the property's fair market value.
>
> "2. Whether the forfeiture of real property worth far more than needed to satisfy a tax debt but sold for [a] fraction of its real value constitutes an excessive fine under the Eighth Amendment, particularly when the debt was never actually owed." Pet for Cert. i.

4 PUNG *v.* ISABELLA COUNTY

Opinion of the Court

We granted review on those questions. 606 U. S. 1066 (2025).

## II

### A

The first question presented is whether "just compensa-tion" following a tax sale is measured by the price that the property fetched at auction or its hypothetical fair market value. We hold that the auction price is the proper baseline, at least when the procedure is fair in light of our country's history of tax sales.

Since the time of Magna Carta, governments have seized property from delinquent taxpayers. *Tyler*, 598 U. S., at 639. When governments collected taxes this way, they were obligated to pay back the "overplus"—that is, the difference between the proceeds of the tax sale and the tax debt. *Id.*, at 639–640. A long legal tradition dating back to the Found-ing embodies this principle.

Federal statutes from the early days of the Republic re-quired the Federal Government to return to the former property owner any surplus proceeds from a tax sale. Act of May 4, 1812, §8, 2 Stat. 727 (for properties located in Washington, D. C.); Act of Jan. 9, 1815, §27, 3 Stat. 174 (na-tionally applicable law that required the refund of the "sur-plus of the proceeds of the sale, after satisfying the tax, costs, charges, and commissions"). Federal statutes en-acted later in the 19th century continued to require the Government to refund only the "surplus of the proceeds of the sale, after satisfying the tax, costs, and charges." Act of July 13, 1866, §9, 14 Stat. 108; Rev. Stat. §3195 (1875).

During all this time, State laws said much the same. See *Tyler*, 598 U. S., at 640, and n. 1. For example, a 1797 Mar-yland law required local officials to return the "overplus" from a tax sale to the former owner. 1797 Md. Laws. ch. 90, §5. Likewise, a 1792 North Carolina statute made the Sher-iff "accountable to the owners of the lands for all monies

Opinion of the Court

which may come into his hands over and above the sums due for public taxes." 1792 N. C. Sess. Laws §6, p. 23. And a 1785 Massachusetts law directed that the "overplus . . . be immediately restored to the former owner." 1785 Mass. Acts p. 568. Shortly after the ratification of the Fourteenth Amendment, a leading treatise surveyed state practices and found several ways of refunding surplus funds—some did so by bond, others through the county treasury—but all refunded only the "surplus" "if the bid exceed the tax." T. Cooley, Law of Taxation 343 (1876).

This Court's precedents applied the same rule. In *United States* v. *Taylor*, 104 U. S. 216 (1881), the Court held that federal law required the Government to issue a large refund following the tax sale of a property worth much more than the owner's tax debt. There, the owner owed just $70.50 in taxes, and the Government sold the owner's property for $3000. *Id.*, at 217. The Court held that the taxpayer was legally entitled to the difference. *Id.*, at 217, 222. Three years later, in *United States* v. *Lawton*, 110 U. S. 146 (1884), the Court recognized the constitutional dimension of the rule. "To withhold the surplus from the owner would be to violate the Fifth Amendment to the Constitution and to deprive him of his property without due process of law, or to take his property for public use without just compensation." *Id.*, at 150. Thus, the Court held that the Government was required to refund a taxpayer $929.50—the surplus generated in a sale to satisfy a $170.50 tax debt. *Id.*, at 149–151. Similarly, in *Nelson* v. *City of New York*, 352 U. S. 103, 109–110 (1956), the Court recognized an owner's right to surplus proceeds, but also explained that this right was not absolute and could be subject to reasonable time limits established by state statute. Finally, in *BFP* v. *Resolution Trust Corp.*, 511 U. S. 531, 545 (1994), this Court interpreted the Bankruptcy Code to allow foreclosure sales for any "price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have

6                PUNG *v.* ISABELLA COUNTY

Opinion of the Court

been complied with." The Court rejected any suggestion that the owner of a foreclosed property is entitled to recover the fair market value of that property. *Id.*, at 538–539.

In short, for hundreds of years, English and American law have allowed the seizure and sale of property as a tax-collection method, provided that the government return any surplus proceeds to the debtor. Our Nation's history and this Court's precedent thus establish the principle that when the government seizes and sells property to collect a tax debt, the owner is entitled to the surplus sale proceeds—nothing less, and nothing more. The baseline for measuring just compensation in the tax-sale context is therefore the sale price, not the property's hypothetical fair market value, at least when the sale is fairly conducted in light of our country's history of tax sales.

B

Neither history nor precedent supports Pung's contrary argument. In support of his position, Pung first cites a recent concurrence by a Justice of the Supreme Court of Michigan that accepts fair market value as the baseline for just compensation under the State Constitution. See *Rafaeli, LLC* v. *Oakland County*, 505 Mich. 429, 485–522, 952 N. W. 2d 434, 466–487 (2020) (Viviano, J., concurring). It goes without saying that a one-Justice concurrence interpreting a state constitutional provision almost 230 years after the Takings Clause's ratification does not shed much light on that Clause's meaning. The more telling feature of that decision is the majority's express rejection of the proposition "that just compensation requires that plaintiffs be awarded the fair market value of their properties." *Id.*, at 483, 952 N. W 2d, at 465. So *Rafaeli,* if anything, undermines Pung's argument.

Pung also cites state-court cases in which courts ordered compensation based on the seized property's fair market value. But those cases concerned governments that

Opinion of the Court

unnecessarily sold multiple discrete pieces of personal property. For example, in *Cone* v. *Forest*, 126 Mass. 97, 101 (1879), a sheriff sold nine of a taxpayer's cows even though the sale proceeds from seven would have covered the tax debt. Because the cows were nine separate pieces of property "sold separately," the Supreme Judicial Court of Massachusetts held that the sheriff committed the tort of conversion by selling the final two, and it ordered him to compensate the taxpayer based on the two cows' fair market value. *Ibid.* Other state courts issued similar rulings in cases where the government seized "several distinct parcels or units of personal property." *Lane* v. *Roma Lumber Co.*, 234 Ala. 551, 552, 176 So. 283, 284 (1937); see also, *e.g.*, *Denton* v. *Caroll*, 4 App. Div. 532, 536–537, 40 N. Y. S. 19, 22 (1896); *Seekins* v. *Goodale*, 61 Me. 400, 402–404 (1873). But here, the County sold just one modestly sized parcel of real property, and Pung does not argue that the parcel could have been subdivided. Thus, even if we assume that a different common-law rule applies when the government sells more property than necessary, that rule does not apply here.[2]

Because Pung lacks tax-sale cases that support his argument, he turns to eminent-domain cases. These cases involve government seizure of property for a public use, like establishing a park or building railroad tracks. *Penn-East Pipeline Co.* v. *New Jersey*, 594 U. S. 482, 487 (2021). In that context, fair market value is the default measure of "just compensation." See, *e.g.*, *Knick* v. *Township of Scott*, 588 U. S. 180, 190 (2019). But what is "just" in one context may not be "just" in another. Even in eminent-domain cases, the Court has "refused to designate market value as the sole measure of just compensation," recognizing that

––––––––––
[2] Pung also argues that, before selling his family's home, the County should have tried to recover the unpaid taxes by less drastic means, such as by seizing and selling his personal property. But, as we will explain, *infra*, at 10–11, this argument is not properly before us.

8 PUNG *v.* ISABELLA COUNTY

Opinion of the Court

"there are situations where this standard is inappropriate." *United States* v. *564.54 Acres of Monroe and Pike County Land*, 441 U. S. 506, 512 (1979) ("'[W]hen market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards'").

Tax sales constitute such a situation. If a property owner receives proper notice that his or her property may be sold to recover unpaid taxes and if the owner believes that the fair market value of the property exceeds the taxes that are due, the owner may be able to avoid foreclosure by refinancing the property or using the property as collateral for a new loan to pay off the taxes. Or the owner may be able to sell the property (or other property) himself before foreclosure, pay off the tax debt, and keep what is left to buy or rent a new home. See, *e.g.*, 26 U. S. C. §6325(b)(3) (permitting discharge of federal tax liens for properties to be sold). Here, the Pungs had years to take these steps and avoid foreclosure. See Mich. Comp. Laws §211.78g(3); §§211.78k(5)–(6). They failed to do so. In such a situation, the traditional rule, under which the taxpayer receives only the difference between the auction sale price and unpaid taxes, is "just."

Pung disagrees because tax sales frequently yield less than could have been obtained if the property had been "sold at leisure and pursuant to normal marketing techniques." *BFP*, 511 U. S., at 539. But tax sales, by their very nature, are incompatible with these techniques. Among other things, tax sales are designed to collect unpaid taxes without undue delay and administrative expense. By contrast, home owners who want to receive the best price for their property may wait to list their house until there is an upswing in the market or until the right buyer comes along.

Pung's fair-market-value theory would impose unprecedented burdens on jurisdictions that wish to collect unpaid taxes and might well make tax sales impractical. In order

Opinion of the Court

to obtain something like fair market value for homes on which they have foreclosed, jurisdictions would have to do what homeowners typically do when they want to sell their homes: either shoulder the burden of selling the property themselves or employ a real estate agent. In the meantime, local governments would have to do without the unpaid taxes and bear the costs and risks that go with the ownership of unoccupied homes.[3]

If, on the other hand, these jurisdictions proceeded with traditional tax-sale procedures, then application of Pung's proposed rule would often produce a net loss. The government would be on the hook for any difference between the foreclosed property's fair market value and the tax-sale price.

To illustrate this problem, consider a hypothetical property with a fair market value of $100,000. Suppose the property owner falls behind on his taxes and owes $20,000 to the local tax authority. The government then seizes the property and sells it at a public auction for $60,000. Under the longstanding historical rule, the government would keep $20,000 to satisfy the tax debt and return to the prior owner $40,000—the surplus proceeds from the tax sale. But under Pung's fair-market-value rule, the government would have to pay the owner $80,000—the property's fair market value minus the value of the tax debt—even though that sum exceeds what the government obtained from the

——————

[3] To name just a few: What would happen if the property did not immediately sell for what the owner claims is the fair market value? Should the government hold out for a higher offer? Or should it sell the property and hope it can convince a court that the owner's estimate of the fair market value was too high? Either way, the government would incur significant cost or risk. Some *amici* point out that various States have enacted regimes that require these kinds of choices. See, *e.g.*, Brief for AARP et al. as *Amici Curiae* 14–17; Brief for Legal Services of New Jersey as *Amicus Curiae* 16–18. But it is one thing for a state legislature to choose such a regime. It is quite another for this Court to impose such a regime as a matter of constitutional law.

10          PUNG *v.* ISABELLA COUNTY

Opinion of the Court

tax sale. Thus, under Pung's rule, a tax sale to collect $20,000 in delinquent taxes would net the government a $20,000 *loss*—a loss paid out to the delinquent taxpayer himself. The possibility of such a perverse result would render tax sales infeasible as a debt-collection mechanism. And jurisdictions with a large inventory of unpaid taxes might well compensate for this lost revenue by increasing the burden on residents who do pay their taxes. So for taxpayers viewed as a group, the demise of tax sales might be a most unwelcome development.

Our task in this case, however, is not to decide whether tax sales as historically conducted represent good public policy. Our authority is limited to deciding whether the Takings Clause requires the transformation Pung advocates, and the answer to that question is clear. Tax sales have been an accepted means for governments to collect debts since the earliest days of our Nation. If the Takings Clause had been understood to impose restrictions that rendered these sales untenable, they would have presumably faded away, at least after the Fourteenth Amendment incorporated the Takings Clause against the States. See *Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226, 241 (1897). Yet these sales remained common then and are common today. That Pung's novel interpretation of the Takings Clause would whisk this longstanding practice into the dust bin is strong evidence that his interpretation is incorrect.

C

To sum up, just compensation in the tax-sale context need not be based on a property's fair market value. That holding answers the first question presented in Pung's petition for certiorari. But in his merits briefing and at oral argument in this Court, Pung raised an additional argument that does not obviously fall within the scope of the first question on which he sought review. He contends that the *procedure* the County followed in seizing and selling his

Cite as: 609 U. S. ____ (2026)          11

Opinion of the Court

property was unfair in several respects. For one thing, he claims that the County seized more property than necessary to satisfy his tax debt. Instead of selling his house, he argues that the County should have seized his money or placed a lien on his property. He also argues that the County assumed the status of a bailee when it seized his property and violated the responsibilities that go with that status. But these arguments do not fit within the scope of the question presented, which asked only whether the Takings Clause requires the government to compensate owners based on their property's fair market value. See Pet. for Cert. i.

In response to Pung's procedural arguments, the parties appear to agree that a jurisdiction might violate the Constitution if it employs blatantly unfair procedures, such as by conducting a sham sale or needlessly delaying a tax sale while real estate prices crashed. But the parties disagree on what constitutes a fair process. According to the County, governments need only follow the contours of state law. For its part, the United States argues that tax sales must be "fairly conducted . . . in light of the Nation's history and tradition of tax sales." Brief for United States as *Amicus Curiae* 26.

We will not resolve any of Pung's newfound procedural arguments. On remand, the Sixth Circuit may decide whether they were properly preserved in that court, and, if they were, may entertain Pung's arguments.[4]

### III

Pung also challenges the seizure and sale of his property under the Excessive Fines Clause of the Eighth Amendment. He argues that the County's failure to compensate him for the fair market value of his property constituted an excessive fine. We also reject this claim.

_____

[4] Similarly, because we find no Fifth Amendment violation, remedial questions are not before us either.

12          PUNG *v.* ISABELLA COUNTY

Opinion of the Court

Forfeiture of property can be a "'fin[e]'" for purposes of the Eighth Amendment if it serves "in part to punish." *Austin* v. *United States*, 509 U. S. 602, 610 (1993); *United States* v. *Bajakajian*, 524 U. S. 321, 328 (1998). To determine whether an exaction is punitive, the Court has consulted historical practice. *Austin*, 509 U. S., at 611–618.

We have already explained that Pung's fair-market-value theory lacks support in either history or precedent. He does not offer any additional historical evidence suggesting that a tax sale which is fairly conducted in light of our Nation's history would violate the Eighth Amendment. Nor has he cited a single decision holding that the government violates the Eighth Amendment by returning only the surplus proceeds from a tax sale. So, like his Fifth Amendment claim, Pung's Eighth Amendment claim lacks historical or precedential support.

In addition, imposing Pung's fair-market-value rule under the Eighth Amendment would invite the same difficulties that would attend his Fifth Amendment theory—namely, the demise of this country's longstanding use of tax sales to collect debts. The Eighth Amendment requires no such thing.[5]

\*          \*          \*

The Pung family lost its property because it failed to pay its taxes. The Fifth Amendment protects the family's right to surplus proceeds from the tax sale, not compensation for the property's fair market value. The Eighth Amendment offers no greater protections. The judgment of the Sixth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

―――――――――

[5] The County argues that the Fifth and Eighth Amendments cannot both apply to the same government action, and the United States argues that the Excessive Fines Clause applies only to fines connected with crimes. Because we reject Pung's Eighth Amendment claim on other grounds, we need not address these broader theories.

Cite as: 609 U. S. ____ (2026)          13

Opinion of the Court

*It is so ordered.*

Cite as: 609 U. S. ____ (2026)  1

SOTOMAYOR, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 25–95

_____

## MICHAEL PUNG, PERSONAL REPRESENTATIVE OF THE ESTATE OF TIMOTHY SCOTT PUNG, PETITIONER *v.* ISABELLA COUNTY, MICHIGAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 23, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE GORSUCH and JUSTICE JACKSON join, concurring.

The Court today rightly rejects petitioner Michael Pung's argument that anytime a government forecloses and sells an individual's home to cover an outstanding tax debt, the Fifth Amendment Takings Clause requires the government to pay the home's "hypothetical fair market value." *Ante*, at 1. As the Court explains, surplus proceeds can be just compensation, assuming that the auction sale is "fairly conducted in light of our country's history of tax sales." *Ibid.* Based on this language, I do not read the Court's opinion as identifying the contours of a fair auction, or endorsing the parties' or the United States' articulations of what this standard requires. The Court correctly leaves those issues for remand, should the Sixth Circuit find them preserved. See *ante*, at 11. With that understanding, I join the Court's opinion.

Opinion of THOMAS, J.

# SUPREME COURT OF THE UNITED STATES

———

No. 25–95

———

## MICHAEL PUNG, PERSONAL REPRESENTATIVE OF THE ESTATE OF TIMOTHY SCOTT PUNG, PETITIONER *v.* ISABELLA COUNTY, MICHIGAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 23, 2026]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins as to all but footnote 1, concurring in part and concurring in the judgment.

The Pung family lived in a modest home in central Michigan. They paid their property taxes on time and in full. When the local tax official wrongly assessed additional property taxes against them, they went to court and won. The tax official then assessed those same additional property taxes against them again, did not disclose that fact in the Pungs' tax bill, and initiated foreclosure proceedings. Although the additional tax bill would amount to only $2,242, the local government took the Pungs' entire home to pay it. It then sold the home and returned to the Pungs less than half of its value. The lower courts upheld the local government's actions. Today, this Court vacates and remands. I write separately about my preliminary view of the proper resolution of the Pungs' claims.[1]

———

[1] I join the Court's opinion as to all but Part II–B because I agree that the auction surplus from a tax foreclosure sale can constitute just compensation if it is consistent with historical practice, and because I agree that the parties should have the opportunity to litigate below whether the local government's conduct here was consistent with that practice.

2                  PUNG *v.* ISABELLA COUNTY

Opinion of THOMAS, J.

I

A

In 1991, Scott Pung bought a three-bedroom ranch-style home for himself, his wife, and their two children. The home sat on a little over half an acre of land in a suburban neighborhood in Union Township. Union Township is a small town in Michigan's Isabella County (County). Pung purchased the property for $125,000.

The Pungs' home was their primary residence. Michigan imposes lower property taxes on primary residences than it does on second homes. Therefore, the Pungs applied for and received an exemption from the higher tax rate that applies to second homes.

The Pungs' home remained their primary residence going forward. When Scott Pung died in 2004, his wife Donnamarie continued to reside there. When Donnamarie died in 2008, her son Marc and his family continued to reside there. The home was continuously owned by Scott Pung's estate, of which Donnamarie and Marc were beneficiaries. The Pungs thus continued to be exempt from the additional property taxes imposed on second homes, and they paid every tax bill in full.

In 2010, after the home had been the Pungs' primary residence for 19 years, the Union Township tax assessor decided that the Pungs were subject to the additional property tax for second homes. She denied the Pungs' exemption for tax years 2007 through 2011. The assessor incorrectly believed that the Pungs were required by state law to file an updated affidavit establishing that the home was their primary residence, which they had not done, so she taxed them as if the home were their second home.

The Pungs challenged the tax assessor's decision and won. A Michigan tax tribunal held that the Pungs did not owe additional property taxes. Instead, the tax tribunal confirmed that the Pungs were liable for the ordinary tax rate they had already paid for a primary residence. This

Opinion of THOMAS, J.

ordeal cost the Pungs considerable resources, but they at least believed that their "troubles . . . were over." App. 111.

B

The tax assessor, however, chose to not respect the court's decision. "I don't care what he says," she said of the judge who ruled for the Pungs. *Id.*, at 61. Although nothing had changed after the tax tribunal's decision, the tax assessor purported to tax the Pungs in 2012 what would eventually amount to $2,242 for those same additional second-home property taxes, related penalties, and interest. Even a decade later, before this Court, the County could not substantiate a legitimate basis for imposing this tax. When asked at oral argument, the County's attorney stated: "I don't know what the township assessor's reasoning was." Tr. of Oral Arg. 97.

The tax assessor imposed the additional tax in a manner that would make it more likely that the Pungs would become delinquent. The original tax bill sent to the Pungs for 2012 did not include the additional tax. The tax assessor imposed the additional tax only after sending out the original tax bill. The executor of the estate, Michael Pung, went to the township offices with a check to pay the full tax amount printed on his bill. At that point, a clerk informed him that an additional tax had been imposed on the estate. Michael explained that the additional tax was not due, brought Marc in with his driver's license to demonstrate to the clerk that the home was his primary residence, and paid the proper amount. The additional improper amount demanded by the township is apparently the only "unpaid" tax in the Pungs' history.

The assessor reported the Pungs' property as delinquent. Then, the Township and Isabella County—whom I will collectively refer to as the County—began foreclosure proceedings. Although the Pungs paid the original tax bill in full, and did not owe the extra amount, the County gave the

4 PUNG *v.* ISABELLA COUNTY

Opinion of THOMAS, J.

Pungs until March 31, 2014 to "redeem" the property by paying the supposed deficiency. The County stated that it mailed the Pungs notice of its intent to foreclose multiple times, but the Pungs stated that they did not receive the notices until after the deadline. They explained that if they "would have received notice," they "undoubtedly would have taken action to prevent the foreclosure." App. 72. In the meantime, the Michigan Court of Appeals affirmed the tax tribunal's decision that the Pungs did not owe the additional property taxes. The County nonetheless persisted with its foreclosure effort.

The state court entered a default judgment of foreclosure against the Pungs' home in 2015. The judgment vested title to the home in the County treasurer. The Pungs moved to set aside the foreclosure judgment for insufficient notice. The trial court set aside the order because the County should have known that the Pungs had not received notice of the foreclosure proceedings and could have easily taken additional steps to inform them.

Rather than allowing the Pungs to keep their home, the County appealed. The Michigan Court of Appeals reversed, holding that the County sufficiently tried to notify the Pungs of its planned foreclosure. So, in June 2018, the Pungs permanently lost title to the home that they had owned for 27 years. The sole basis for the foreclosure was the additional property tax in 2012 that was not in their tax bill and not authorized by law.

The County, having foreclosed on the Pungs' home, sold it. The County had determined that the fair market value of the Pungs' property for the purpose of property taxes— including the property taxes that formed the basis for this suit—was $194,400. But, when the County sold the Pungs' property, it sold it for only $76,008, under 40% of its fair market value. Less than 18 months after the auction, the new owner sold the property on the open market for $195,000, almost exactly its earlier assessed value.

Opinion of THOMAS, J.

Initially, the County kept all of the sale proceeds. When the Pungs went to federal court later, the court ordered the County to give them back $73,766, which represented the surplus proceeds beyond the amount that went to pay the extra tax. That means that even if the tax were proper—which it was not—the Pungs lost about $118,000 as a result of a supposed debt of $2,242.

On appeal, the Pungs argued that when the County took their $194,400 home based on the $2,242 debt, its payment of only $76,008 (including the amount credited to the Pungs' "debt") was not "just compensation" under the Takings Clause. The Sixth Circuit, constrained by prior panel precedent, denied the Pungs relief because the auction value was the "best evidence" of the fair market value of the property. *Pung* v. *Kopke*, 2025 WL 318222, *3–*4 (Jan. 28, 2025) (internal quotation marks omitted).

## II

"[P]roperty is a natural, fundamental right." *Kelo* v. *New London*, 545 U. S. 469, 510 (2005) (THOMAS, J., dissenting). The "principal aim of society is to protect individuals in the enjoyment of those absolute rights, which were vested in them by the immutable laws of nature," including the "rights of private property." 1 W. Blackstone, Commentaries on the Laws of England 120, 135 (1765) (Blackstone). To that end, the Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." "[I]t is 'imperative that the Court maintain absolute fidelity to' the [Takings] Clause's express limit on the power of the government over the individual, no less than with every other liberty expressly enumerated in the Fifth Amendment or the Bill of Rights more generally.'" *Kelo*, 545 U. S., at 507 (THOMAS, J., dissenting) (quoting *Shepard* v. *United States*, 544 U. S. 13, 28 (2005) (THOMAS, J., concurring in part and concurring in judgment)).

6                  PUNG *v.* ISABELLA COUNTY

                   Opinion of THOMAS, J.

The Takings Clause forbids the government from taking a person's property unless it provides "just compensation." In this case, all agree that the government took the Pungs' property and therefore owed the Pungs just compensation. See *Tyler* v. *Hennepin County*, 598 U. S. 631, 647 (2023). Just compensation generally requires paying fair market value. Regardless of when exactly the history of tax foreclosure sales can justify a departure from that rule, my initial impression is that it cannot do so in this case.

A

Isabella County took title to the Pungs' property in 2015, then had that title made permanent on appeal in 2018. Under this Court's decision in *Tyler* v. *Hennepin County*, a foreclosure procedure such as the one employed here constituted a "taking under the Fifth Amendment." *Ibid.* Accordingly, the County owed the Pungs "just compensation." This case concerns only what "just compensation" means.

Just compensation ordinarily requires paying the owner the fair market value of his property. As Blackstone wrote, the government must provide "a full indemnification and equivalent for the injury thereby sustained." 1 Blackstone 135; accord, *Kelo*, 505 U. S., at 510 (THOMAS, J., dissenting). The owner must be placed "in as good position pecuniarily as he would have occupied if his property had not been taken." *United States* v. *Miller*, 317 U. S. 369, 373 (1943). In other words, "[h]e must be made whole." *Olson* v. *United States*, 292 U. S. 246, 255 (1934).

To make the owner whole, "just compensation normally is to be measured by 'the market value of the property at the time of the taking.'" *United States* v. *50 Acres of Land*, 469 U. S. 24, 29 (1984) (quoting *Olson*, 292 U. S., at 255). Fair market value, a familiar legal concept, means what "a willing buyer would pay in cash to a willing seller." *Miller*, 317 U. S., at 374; see also Black's Law Dictionary 1871 (12th ed. 2024) ("The price that a seller is willing to accept

Opinion of THOMAS, J.

and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect"). Anything less than fair market value is ordinarily not just compensation.

The Pungs did not receive fair market value. In this case, the fair-market-value analysis is straightforward because the County itself already assessed the property's fair market value. The County assessed the fair market value of the Pungs' property at $194,400. "The principles governing the ascertainment of value for the purposes of taxation," this Court has explained, are the "same as those that control in condemnation cases, confiscation cases and generally in controversies involving the ascertainment of just compensation." *Great Northern R. Co.* v. *Weeks*, 297 U. S. 135, 139 (1936). Therefore, because the County "has already calculated the amount of just compensation in this case, when it [assessed] the [Pungs] the fair market value of the [home]," it "cannot now disavow that valuation" by asserting a lower value when it benefits the County. *Horne* v. *Department of Agriculture*, 576 U. S. 351, 370 (2015). "The full and true value of the property" as assessed for tax purposes is identical to "the amount that the owner would be entitled to receive as just compensation upon a taking of that property by the State." *Great Northern R. Co.*, 297 U. S., at 139. Perhaps for that reason, the County did "not challeng[e] . . . that the value of the property is at least $194,400." App. to Pet. for Cert. 29a. The Pungs received, when accounting for the credit, only $76,008. They therefore did not receive fair market value.

The County initially argued, and the Sixth Circuit reasoned below based on its precedent, that the Pungs nonetheless received fair market value because a property is worth less when it is foreclosed upon. See 2025 WL 318222, *3 ("After all, 'the best evidence of a foreclosed property's value is the property's sales price'").

8 PUNG *v.* ISABELLA COUNTY

Opinion of THOMAS, J.

That argument is mistaken. As this Court has already explained, fair market value "does not include . . . any element resulting subsequently to or because of the taking," such as government-initiated foreclose proceedings. *Olson*, 292 U. S., at 256. Because the foreclosure itself does not affect "elements of value that *inhere* in the property"—such as the land or the building—it cannot affect fair market value in the relevant sense. *Id.*, at 255 (emphasis added). Likewise, the County may regret its taking and want to avoid losing money, but this Court's precedents also reject the notion that just compensation can take account of the County's interests or its desire to avoid losing money. "It is the owner's loss, not the taker's gain, which is the measure of the value of the property taken." *United States* v. *Causby*, 328 U. S. 256, 261 (1946).

B

According to the County, the government may depart from the fair-market-value rule whenever the government forecloses on the property based on a tax debt and then sells it at an auction. See Brief for Respondent 1–2. In such a case, the County argues, just compensation is measured by the amount for which the property sold at auction, not the fair market value. On this theory, if a taxpayer owes any taxes, then the government can take the entire property belonging to that taxpayer, sell it at auction at a vastly reduced price, and then return to the taxpayer only the "surplus." *Ibid.* Thus, for instance, if a family with a $400,000 property owed the taxing authority $1,000, the County could take their home, sell it for $1,000, and return nothing.[2]

---

[2] This example is not farfetched. According to the *amicus* briefs submitted in this case, local governments engage in such practices with some regularity. For example, a West Virginia owner's $65,000 property was sold for $2,700 to satisfy an $80 tax lien; a Baltimore owner's $140,000 property was sold for $5,000 to satisfy a $2,500 tax lien; and a Nebraska

Cite as: 609 U. S. ____ (2026)          9

Opinion of THOMAS, J.

1

This Court has previously held that the rule that just compensation means fair market value admits of only two exceptions, neither of which applies here. "'Just compensation,' we have held, means in most cases the fair market value of the property on the date it is appropriated." *Kirby Forest Industries Inc.* v. *United States*, 467 U. S. 1, 10 (1984) (quoting *United States* v. *564.54 Acres of Monroe and Pike County Land*, 441 U. S. 506, 511–513 (1979)). "Other measures of 'just compensation' are employed only 'when market value [is] too difficult to find, or when its application would result in manifest injustice to owner or public.'" *Kirby Forest Indus., Inc.*, 467 U. S., at 10, n. 14 (quoting *United States* v. *Commodities Trading Corp.*, 339 U. S. 121, 123 (1950)); accord, *Brown* v. *Legal Foundation of Wash.*, 538 U. S. 216, 244 (2003) (Scalia, J., dissenting) ("Our cases have recognized only two situations in which [the fair-market-value] standard is not to be used: when market value is too difficult to ascertain, and when payment of market value would result in 'manifest injustice' to the owner or the public").

No party argues that either of these "only" two exceptions applies to this case. *Kirby Forest Indus.*, 467 U. S., at 10, n. 14. It is not "too difficult to find" the "market value" of an ordinary suburban home; the County already did so in assessing the amount of the tax that the Pungs owed.

_____

owner's $59,000 property was sold for $588 to satisfy his $588 tax lien. See Brief for Maryland Legal Aid et al. as *Amici Curiae* 1. In Washington, D. C., the average property sold based on a tax lien sold for $17,400, while the average tax-assessed value of the underlying properties was $578,100. *Id.*, at 9; see also Brief for Chamber of Commerce of the United States as *Amicus Curiae* 9 (describing case where $300,000 property was sold for $1,213). The Federal Government has also been known to abuse the eminent-domain power. See, *e.g.*, N. Y. Times, June 30, 2010, section A, p. 16 (describing the confiscation of the homes of a thriving community of black landowners in Harris Neck, Georgia).

10                PUNG *v.* ISABELLA COUNTY

Opinion of THOMAS, J.

Likewise, there is no injustice, let alone manifest injustice, in paying the Pungs in full for their home.

This case thus implicates a new exception for tax foreclosure sales. The County argues that the history of tax foreclosure sales supports its conduct here. I agree that sufficient historical evidence can justify an exception to the fair-market-value rule, and I join the Court's opinion on that basis. But, any exception based on history can be no broader than what that history justifies. And, on my initial view, any history of tax foreclosure sales reflects a greater respect for principles of just compensation than the County showed the Pungs here.

2

Historically, tax foreclosure sales were subject to strict limits. These limits, among other things, protected the property rights of the homeowner and helped to avoid a conflict between tax foreclosures and the Takings Clause. "[G]reat strictness [was] required; and . . . the provisions of law preparatory to and authorizing such sales," had to be "punctiliously complied with." T. Cooley, Law of Taxation, Including the Law of Local Assessments 325 (1876) (Cooley) (internal quotation marks omitted). Tax foreclosure sales, it was said, "deserve no indulgence from the court," and "he who claims under a forfeiture, must shew that the law has been exactly complied with." *Wilsons* v. *Bell*, 34 Va. 22, 24 (1836).

Two related limits are most relevant when the government takes an entire home to pay for a small tax debt, as it did to the Pungs. First, the government had to try to sell the taxpayer's personal property before it moved on his real property. "[B]efore the power to sell the land can exist," the government was required to first show "the demand . . . and return of no goods." R. Blackwell, A Practical Treatise on the Power to Sell Land for the Non-Payment of Taxes 28 (4th ed. 1875). "The power [to sell land] exists only where

Opinion of THOMAS, J.

there are no goods." *Scales* v. *Alvis*, 12 Ala. 617, 620 (1847). This principle had roots in Chapter 9 of the Magna Charta, in which the King promised: "Neither We nor Our bailiffs shall seize any land or rent for any debt so long as the debtor's chattels are sufficient to discharge the same . . ." A. Howard, Magna Carta: Text and Commentary 39 (rev. ed. 1998).

American foreclosure law long imposed a similar requirement. "Until [the personal property] has been exhausted, no authority exists to go further." Cooley 307; accord, *e.g.*, 1792 N. C. Sess. Laws p. 23, §5 (government can "sell the [debtor's land] or so much thereof as shall be sufficient for the payment of the taxes due," but only if he first found that the debtor had "no visible personal property on which the Sheriff can distrain"); Miss. Code, Art. 1, §20, p. 902 (1848) ("No writ of [seizure] shall be levied on lands and tenements, if personal property sufficient to satisfy such execution be tendered to the sheriff, or other officer, by the debtor"). The tradition recognized that it is especially unjust to take a man's home to settle a small debt when selling personal property would do.

Second, before foreclosing on a delinquent taxpayer's entire property, the government had to pursue only part of the property first. As this Court explained in *Tyler*, "[i]n collecting taxes, the new Government of the United States could seize and sell only so much of [a] tract of land . . . as may be necessary to satisfy the taxes due thereon." 598 U. S., at 640 (internal quotation marks omitted). "'[I]f a whole tract of land was sold when a small part of it would have been sufficient for the taxes,'" then "'the collector unquestionably exceeded his authority.'" *Ibid.* (quoting *Stead's Executors* v. *Course*, 4 Cranch 403, 414 (1808) (Marshall, C. J., for the Court)). Thus, a small property tax bill such as the Pungs' would not justify an immediate sale of the entire property. See also, *e.g.*, Cooley 343; *Martin* v. *Snowden*, 59 Va. 100, 147 (1868).

Opinion of THOMAS, J.

If the government did not attempt to sell either part of the property or personal property first, then the taxpayer could reclaim his property or compensation for the taking. "A sale of the whole when less would pay the tax," such as the County's sale here, "is void." Cooley 343; accord, *Slater* v. *Maxwell*, 6 Wall. 268, 274 (1868) ("The sale of the entire tract in one body would have vitiated the proceeding, if bids could have been obtained upon an offer of a part of the property"). A property owner in the Pungs' position was entitled to relief from the government in trespass or trover for taking more than was necessary to repay the debt. See *Denton* v. *Carroll*, 4 App. Div. 532, 537, 40 N. Y. S. 19, 22 (1896) ("When several chattels are seized, and enough have been sold to satisfy the [tax] demand, the sale of the remainder is a trespass, and the officer becomes liable"); *Cone* v. *Forest*, 126 Mass. 97, 101 (1879) ("It is well settled that an officer is answerable in trover for property sold on execution, after he has realized money sufficient to satisfy his writ"); Cooley 564 ("[T]he collector is liable as a trespasser *ab initio* . . . if, having sold enough to satisfy the tax, he proceeds to sell more").

The measure of damages for a trespass or trover action based on improper foreclosure procedures was fair market value—which may explain how foreclosure sales could exist in harmony with the Takings Clause. See, *e.g.*, *Gilson* v. *Wood*, 20 Ill. 37, 39 (1858) ("[T]he measure of damages [in trespass] is, what the property is proven to have been worth at the time it was taken and carried away by the defendant" (internal quotation marks omitted)); *Burns* v. *Campbell*, 71 Ala. 271, 291 (1882) ("The measure of damages in actions for trespass to goods, where the taking is unlawful without more, is generally *the value of the goods*, or the amount of injury done to them, as the case may be, *with interest* to the date of judgment"); *Gove* v. *Watson*, 61 N. H. 136, 137 (1881) ("In an action of trover, the value of the property at the time of the conversion (with interest after) is in general the

Opinion of THOMAS, J.

measure of damages. A return and acceptance of the property after conversion . . . go only in mitigation of damages"). Even after the foreclosed-upon property had been sold, the former owner could sue to reclaim fair market value if these limits had not been adhered to. See, *e.g.*, *Seekins* v. *Goodale*, 61 Me. 400, 404–405 (1873) (holding that officer who sold more cloth than needed to cover debt was liable in trespass for their full value).

Here, the County did not try to collect anything less than the entire property—such as the Pungs' personal goods, their car, or a portion of their land. Instead, for a mere $2,242 debt, the County proceeded immediately to the seizure of the Pungs' entire $194,400 home. So, although the County invokes history and tradition to justify its departure from the fair-market-value rule, its actions here seem to have departed from that history and tradition. The parties below had not addressed these questions at summary judgment because the dispute at that stage concerned the County's antecedent argument that it did not take the Pungs' house at all. See 632 F. Supp. 3d 743, 747 (ED Mich. 2022). The County did not argue in the alternative that, if it took the Pungs' house, the taking should be valued at anything other than fair market value. See Response by Defendants in *Pung* v. *Kopke*, No. 1:20–cv–13113 (ED Mich.), ECF Doc. 12. Accordingly, in my view, these issues should remain open on remand.

The County's procedure also appears to have departed from historical limits in other ways. Historical tax foreclosure procedures included rigorous notice requirements, which helped ensure that the foreclosed upon taxpayer had a clear opportunity to preserve his property. See, *e.g.*, Cooley 334–337. But here, the township based its foreclosure on a tax that it imposed after sending the Pungs their tax bill, then foreclosed on the property despite the Pungs' statement that they did not receive notice of the delinquency and would have promptly paid it—as they had paid

14    PUNG *v.* ISABELLA COUNTY

Opinion of THOMAS, J.

all of their other taxes—if they had received notice. Historical tax foreclosure sales also included rigorous procedures to ensure that the auction price of whatever property was sold matched, as nearly as possible, the fair market value of that property. See Cooley 305–309, 315–319; see also, *e.g.*, *Clute* v. *Barron*, 2 Mich. 192, 194–196 (1851); *Cocks* v. *Izard*, 7 Wall. 559, 562 (1869); *Cahoon* v. *Coe*, 57 N. H. 556, 597–598 (1876); *Gelfert* v. *National City Bank of N. Y.*, 313 U. S. 221, 231 (1941). But here, the County sold the property in an auction that generated less than half of its assessed value and less than half of what it sold for on the market again less than 18 months later.

3

The County's response is that if it is not able to take people's homes and sell them at auction in the manner that it did here, it will not be able to efficiently collect taxes. It argues that a fair-market-value rule would impede "the government's ability" to foreclose on homes in order to collect delinquent taxes. Brief for Respondent 26.

In my view, that is the point of the Takings Clause, which necessarily prioritizes homeowners' property rights over the government's interest in efficiency and public necessity. "William Blackstone wrote that 'the law of the land . . . postpone[s] even public necessity to the sacred and inviolable rights of private property.'" *Kelo*, 545 U. S., at 505 (THOMAS, J., dissenting) (quoting 1 Blackstone 134–135). Whatever utilitarian desire the State may have for a tax-collection system that effectively confiscates citizens' homes based on small tax debts, citizens such as the Pungs have an antecedent and higher right to those homes.

III

The government exists to protect property; property does not exist to support the government. "[O]ne of the most certain tests of the character and value of the government" is

Cite as: 609 U. S. ____ (2026)          15

Opinion of THOMAS, J.

"the fulness and sufficiency of the securities which surround the individual in the use and enjoyment of his property." *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 324 (1893). What Isabella County did to the Pungs was wrong, and, on my initial view, likely unconstitutional.